GEORGE A. PHELPS, T. A. PHELPS AND DAN LAWSON, D/B/A PHELPS BROTHERS PRODUCE COMPANY v. THE CITY OF WINSTON-SALEM.

(Filed 22 November, 1967.)

**1. Fires § 3—**
    Proof of the origin of the fire causing the damages in suit may be shown by circumstantial evidence, but the evidence in order to be sufficient to be submitted to the jury must have sufficient probative force to justify the jury in finding that the fire was proximately caused by the negligence of the defendant.

**2. Evidence § 21—**
    Circumstantial evidence is evidence of facts from which other facts may be logically and reasonably deduced.

**3. Negligence §§ 1, 7—**
    The law does not charge a person with all the possible consequences of his negligence, nor that which is merely possible; if the connection be-

tween the negligent act and the injury appears unnatural, unreasonable and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause.

4. **Fires § 3—— Evidence that defendant allowed combustible materials to accumulate held insufficient to support a jury finding of defendant's negligence in causing fire.**

Plaintiff's evidence tending to show that the defendant operated a public market in which tenants were assigned space within the building to sell produce, that flammable material was found in several sections of the building, that there were oil-burning stoves with cracks in them, and that materials of a combustible nature covered almost all of the wooden roof of a shed which had been constructed inside the building, and that the fire had started in the vicinity of the shed, is insufficient to be submitted to the jury on the issue of defendant's negligence in causing the fire complained of, when the only evidence relating to the cause of the fire was that it was unknown.

5. **Same——**

Proof of the burning alone is insufficient to establish liability for damage to property by fire, since, nothing else appearing, the presumption is that the fire was the result of accident or some providential cause.

6. **Same——**

Plaintiff's contention that the defendant's failure to provide fire fighting equipment was a proximate cause of damages to plaintiff's property by fire is without merit when all the evidence tends to show that, had the equipment been available, there would have been insufficient time to extinguish the fire.

BOBBITT, J., joins in result.

HIGGINS and SHARP, JJ., dissent.

APPEAL by plaintiffs from *Gambill, J.,* 17 April 1967 Civil Session, FORSYTH Superior Court.

This is an action to recover damages sustained as a result of a fire at the Winston-Salem Public Market. From a judgment of non-suit the plaintiffs appeal.

The plaintiffs alleged that the City of Winston-Salem owned a building known as the Public Market in which it rented space for stalls to produce dealers who there marketed their products, and in doing so it was engaged in a private rather than a governmental function. W. E. Holland, Jr. managed the building and the City Market, and plaintiffs alleged that he knew there was an oil tank inside the market that created a hazardous fire condition; that he knew there was a coal bin at one entrance and that several tons of coal were in close proximity to "pot-bellied" stoves which were scattered around the building and used to heat it; that debris, boxes

and other flammable materials were also there and that defective electric wiring was also known to Holland. Plaintiffs further alleged that a salamander (a portable stove or incinerator) was allowed to remain in the premises and that Holland had been warned as to its danger; that the premises were not centrally heated and had to be heated by small coal and oil operated stoves which constituted fire hazards. Despite these hazards, the defendant had installed no fire-fighting equipment and provided no fire prevention supervision.

The plaintiffs further alleged that on 5 March 1959 a fire originated in the vicinity of the coal bin and a tomato shed where many inflammables were nearby; that several "pot-bellied" stoves were burning; that one of them had cracks in it through which fire seeped out; and that the fire rapidly spread all over the building, destroying property belonging to the plaintiffs and damaging them to the extent of $27,910.00.

In an amendment to the complaint, it was alleged that the City violated several sections of the Fire Prevention Code which had been adopted as an ordinance; that ethylene gas cylinders were stored in the building; that they were highly inflammable and subject to explosion; that they were required by law to be stored in a cool place and that the defendant failed to comply with the law; that after the fire was almost extinguished, it reached one of the cylinders, causing an explosion that put the entire building in a flaming condition.

The plaintiffs summarized the negligence of the City as knowingly permitting dangerous and flammable substances, defective stoves, poor electric wiring, failing to provide fire-fighting equipment, and failing to have a night watchman on duty, all of which caused its loss.

The defendant denied the material allegations of the complaint, pleaded governmental immunity, said that it maintained a night watchman, that the fire originated from unknown causes and that it spread so rapidly that there was no opportunity to use fire-fighting equipment; that the City Fire Department arrived on the scene almost immediately after the fire was discovered but that it was unable to prevent loss to the plaintiffs. It further alleged that even if the operation of the building was a private function that the prevention and extinguishment of fires was a governmental function and thereupon denied liability.

The evidence taken in the light most favorable to the plaintiffs tends to show that the defendant operated the Public Market in the exercise of its proprietary function and that the plaintiffs were three of several week-to-week tenants in the market, a building of concrete and steel construction. Each such tenant was assigned an

unpartitioned space in the building for the carrying on of his pro-
duce business. The building was managed by the City through its
agent, although each individual tenant was responsible for policing
his assigned space. General control over the building was retained
by the City, as shown by the manager's supervision of parking within
the building, admonitions to tenants to keep their premises clean,
and control over the uses made of and modifications made to the
leased spaces.

On the space rented to L. R. Blalock, Sr. he had constructed a
two-room concrete block shed for use in a tomato "curing" opera-
tion and as an office. Both rooms had an oil circulator heating sys-
tem, which had been installed with the permission of the manager
of the Market. One of the exhaust pipes protruded from the side of
the Market building; the other protruded through the wooden roof
of the shed and discharged smoke into the Market Building itself.
Combustible materials such as bales of shredded cellophane, flat
baskets, bushel baskets, bean hampers, wood crates, tomato boxes
and cabbage bags covered eighty per cent of the roof to a height of
about ten feet, and were visible from the floor of the Market Build-
ing. Sometime prior to the fire from which this dispute arose, there
had been a small fire on the roof of the shed of which the manager
had knowledge and which he had failed to report, nor had he taken
corrective action in respect to the storage of combustibles on the
roof. The fire was first discovered by the privately employed night
watchman of another tenant. He testified that on 5 March 1959
about 1:00 A.M. he was making his rounds and saw a fire about
two feet over the top of the roof of the Blalock shed; that he started
waking up people whom he knew to be in the Market Building; that
after he woke up the last man he ran out and there was an explo-
sion, spreading the fire all over the building.

The Fire Chief and the Captain in charge of the Fire Preven-
tion Bureau both testified they could not determine the cause of the
fire. It appeared to be the undisputed evidence that the City pro-
vided no fire-fighting apparatus of any kind in the building; indeed,
the only source of water was a spigot at the far end of the building
away from the Blalock shed.

The Court dismissed the action as of nonsuit, and the plain-
tiffs appealed.

*Hatfield, Allman and Hall by Roy G. Hall, Jr., Attorneys for
plaintiff appellants.*

*Womble, Carlyle, Sandridge & Rice by I. E. Carlyle and Allan
R. Gitter, Attorneys for defendant appellee.*

PLESS, J. Proof of the origin of fires usually presents a difficult, if not impossible, problem. It is extremely rare that direct evidence is available; consequently, as in this case, circumstantial evidence is the only available method in a large majority of actions, either civil or criminal.

The law in such cases is usually found where arson is charged or where railroad engines are alleged to have started the fire. Notwithstanding the necessity of its use in such cases, we cannot vary or liberalize the law of circumstantial evidence for this purpose.

Generally speaking, circumstantial evidence is evidence of facts from which other facts may be logically and reasonably deduced. In criminal cases, it must point unerringly to the guilt of the defendant and, in effect, must show not only that the defendant is guilty but that upon no reasonable interpretation of the evidence could he be innocent. And also, that if the evidence is consistent with a finding of either guilt or innocence that the innocent interpretation must be adopted.

The law in civil cases is so similar that little difference can be found. The "innocent interpretation" is applicable when we recall that the defendant, in such cases, is not required to prove his lack of responsibility, but the plaintiff must affirmatively fix it upon the defendant by the greater weight of the evidence. And it is not sufficient to show that the circumstantial evidence introduced *could* have produced the result — it must show that it *did*.

No citation or authority is needed to support the above well-established and universally accepted statement of the law of circumstantial evidence. However, we cite *Maguire v. R. R.*, 154 N.C. 384, 70 S.E. 737, in which some of the above principles are discussed. In that case the plaintiff showed that the railroad's right-of-way was in foul condition and that combustible material had been allowed to accumulate which caught fire and spread to the plaintiff's lands. The Court said that was not sufficient, that it must also be shown "that the defendant communicated fire from its engine to its foul right of way." And it must not only prove that the fire *might* have proceeded from the defendant's locomotive, but it must show by reasonable affirmative evidence that it *did* so originate. Citing *Ice Co. v. R. R.*, 122 N.C. 881, 29 S.E. 575. Later, the Court said:

> "There was every opportunity for this fire to have originated from some other source as well as from defendant's engine. All that can be reasonably said is that the fire *may* possibly have been set out by the engine, and it is equally true that it may not. As was said in *Peffer v. R. R.*, 98 Mo. App., 291, in which

the evidence that the fire was set out by the defendant was much stronger than in the present case, 'The truth is in such doubt as that to say one way or the other is no more than guessing.' "

In *Moore v. R. R.*, 173 N.C. 311, 92 S.E. 1, the Court made some statements we think pertinent here. Although that case related to a claim that the railroad's defective locomotive set fire to the plaintiff's property, the reasoning seems applicable.

"It is undoubtedly true that the fact in controversy here, as to the origin of the fire, may be established by circumstantial evidence, but the circumstances proven must have sufficient probative force to justify a jury in finding that the fire originated from a spark from defendant's engine before the issues can be submitted to them. . . . This Court has used various forms of expression in commenting on the subject."

The Court then quoted excerpts from various cases: "[I]f the evidence is 'conjectural or speculative, it should not be submitted to the jury.' . . . [T]he evidence must amount to more than that which raises 'a possibility or conjecture of a fact.' . . . 'There must be evidence from which they might reasonably and properly conclude that there was negligence.' . . . 'Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the parties having the burden of proof, unless the evidence be of such character as that it would warrant a jury to proceed in finding any verdict in favor of the party introducing such evidence.' "

The Court said that Professor Wigmore regarded as the best and fairest statement of the most satisfactory test that can be adopted the following question: " 'Are there facts in evidence which, if unanswered, would justify men of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain?' "

The Court then said:

"There are many unaccountable ways by which sawmills catch fire, for they are notoriously very bad fire risks. . . . There are hundreds of lumber mills situated very near railroad tracks in this State, and to hold passing engines responsible for every unexplained fire that breaks out in them, without other evidence, would impose too great a liability upon the common carriers who are compelled to serve them."

Chief Justice Clark in a concurring opinion in the *Moore* case, *supra,* said:

"While direct evidence that the fire was caused by the negligence of the defendant is not required, but it may be inferred by the jury from the attendant circumstances, there must be more than bare evidence of a possibility, or even a probability, that the fire was so caused."

The law does not charge a person with all the possible consequences of his negligence, nor that which is merely possible. A man's responsibility for his negligence must end somewhere. If the connection between negligence and the injury appears unnatural, unreasonable and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause. It imposes too heavy a responsibility for negligence to hold the tort feasor responsible for what is unusual and unlikely to happen or for what was only remotely and slightly probable. 38 Am. Jur., Negligence, § 61.

In 38 Am. Jur., Negligence, § 85, it is said:

"[L]iability for negligence in keeping a dangerous instrumentality, . . . which may be incurred, under certain social conditions, by the maintenance of an agency which is excessively dangerous to life and limb, is not an absolute liability. The mere fact that an instrumentality may become dangerous to others does not constitute its possessor an insurer against injury that may result therefrom."

It must still be shown that the alleged dangerous instrumentality proximately caused the damage complained of.

The plaintiffs claim that the City was negligent in permitting combustibles to accumulate on the roof of the shed where one fire had already occurred because of the hot oil heater flue. Although there is evidence that the fire started in the vicinity of the Blalock tomato shed and its roof was cluttered with combustible and flammable materials, the only evidence relating to the cause of the fire is that it was "unknown."

The case of *Maharias v. Storage Co.*, 257 N.C. 767, 127 S.E. 2d 548, is very much in point. There the plaintiff's restaurant was damaged by a fire which originated in a room of a nearby warehouse owned by the defendant. The Assistant Fire Chief testified that in his opinion the fire could have been caused by spontaneous combustion of a pile of furniture-polishing rags in the room of the warehouse; however, he also admitted that it was "possible that this fire could have happened from any one of a number of causes." The Court said:

"Plaintiff alleges that his loss was proximately caused by the negligence of defendant in permitting a pile of rags covered

by highly inflammable fluid to accumulate, and that the fire resulted from spontaneous combustion of the pile of rags.

"Nonsuit was proper. The evidence raised a mere conjecture, surmise and speculation as to the cause of the fire. A cause of action must be based on something more than a guess."

The evidence here is not even as strong as it was in that case, however, because neither of the experts offered by the plaintiffs testified that the fire even *could* have been caused by the accumulation of combustibles on the roof of the shed. Their testimony was that the cause of the fire was unknown.

In order to go to the jury on the question of defendant's negligence causing the fire, plaintiffs must not only show that the fire *might* have been started due to the defendant's negligence, but must show by reasonable affirmative evidence that it *did* so originate. *Moore v. R. R., supra.* In *Lumber Co. v. Elizabeth City*, 227 N.C. 270, 41 S.E. 2d 761, the Court held that nonsuit was proper where the origin of the fire was left in speculation and conjecture.

This is an "unexplained fire". Proof of the burning alone is not sufficient to establish liability, for if nothing more appears, the presumption is that the fire was the result of accident or some providential cause. There can be no liability without satisfactory proof, by either direct or circumstantial evidence, not only of the burning of the property in question but that it was the proximate result of negligence and did not result from natural or accidental causes. 5 Am. Jur. 2d, 836.

Here, combustible material was on the roof, there were oil burning stoves with cracks in them, and flammable material was in several sections of the building. For some of these conditions the City might have been responsible, but the tenants and customers may have been responsible for the remainder. People were sleeping in the building and were coming in and going out all through the night. It is possible that anyone of them may have let a lighted cigarette or a still-burning match come in contact with some of the combustible material. This is purely conjectural, of course, but so is the plaintiffs' evidence which seeks to hold the City responsible. It was not sufficient to be presented to the jury.

The plaintiffs also seek to recover upon the theory that the City was negligent in not furnishing fire fighting equipment for the building and that its absence allowed the fire to spread and hence was a proximate cause of damage to plaintiffs' property on another side of the warehouse from the Blalock shed where the fire was first sighted. Here again, the plaintiffs are met with absence of proof of any causal connection between the lack of fire fighting equipment

PHELPS v. WINSTON-SALEM.

and damage to them. The plaintiffs have offered no evidence that under the conditions existing at the time the fire was discovered it could have been extinguished if the equipment had been available. Stated in classical textbook terminology: but for the lack of fire fighting equipment, the fire could and would have been extinguished at its source, and plaintiffs' damage would not have ensued. Such a contention is not supported by the evidence.

Mr. Fearington, the night watchman who discovered the fire, and the only one in a position to extinguish it, testified concerning the size of the fire which he discovered on top of the Blalock tomato shed. He then said: "I didn't pay much attention [to the fire]; I went to trying to get them fellows out of there that was asleep." Although he knew there was no water near Blalock's shed, nor fire fighting equipment in the Market, there is nothing in his testimony which suggests that he would have used such equipment had it been available, for he also knew there were people sleeping in the building. His first and natural concern was for their safety. He awakened the men sleeping in the building as expeditiously as possible. Even at this point he gave no thought to fighting the fire, which the first man awakened testified ". . . looked so dangerous, I cranked my truck up; . . . backed through produce and ran out the southeast corner. I saved my truck and my life, I believe."

Mr. Fearington further testified that after awakening the last man, "I started out as fast as I could, going to the door to go up there to turn in the fire alarm. . . . I had just about hit the sidewalk when that explosion went off. . . . It throwed fire all over the whole building."

None of the evidence allows an inference that fire fighting equipment would have been used if available. The night watchman's concern was for human life, and properly so; having attended to that priority matter, his next impulse was to call for professional fire fighters, which he did. The night watchman used his time wisely, and possibly just escaped with his life. In retrospect, there was no time to fight the fire, so lack of fire fighting equipment could hardly have been a proximate cause of plaintiffs' loss.

The plaintiffs complain of the exclusion of other evidence offered by them. We do not consider it relevant but have nevertheless taken it into consideration in determining that the judgment of nonsuit was proper. In the trial below, there was

No error.

BOBBITT, J., joins in result.

HIGGINS and SHARP, JJ., dissent.